Carl D. BARTHOLOMEW et
al., Plaintiffs,

v.

VIRGINIA CHIROPRACTORS ASSOCIA-
TION, INC., et al., Defendants.

Civ. A. No. 77–0062(R).

United States District Court,
W. D. Virginia,
Roanoke Division.

May 19, 1978.

James C. Roberts, Mays, Valentine, Davenport & Moore, Richmond, Va., for Virginia Chiropractors Association, Inc., et al.

Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., Sidney S. Rosdeitcher, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Aetna Casualty and Surety Co.

Sigmund Timberg, Washington, D. C., James P. Hart, Jr., Hart & Hart, Roanoke, Va., for American Chiropractic Association, Inc.

## OPINION

TURK, Chief Judge.

The plaintiffs in this anti-trust case ask damages and injunctive relief for violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Plaintiffs are five chiropractors engaged in the private practice of chiropractic in Virginia and West Virginia who challenge the peer review procedure utilized by health insurance carriers in conjunction with the Virginia Chiropractors Association. They allege that the defendants engage in a conspiracy and combination to fix prices and to boycott, coerce, and intimidate plaintiffs in an effort to monopolize the practice of chiropractic.

Defendants Metropolitan Life Insurance Company, the Aetna Casualty and Surety Company, and The Travelers Insurance Company provide health insurance coverage to individuals and groups that includes coverage for chiropractic services. The insurance contracts limit reimbursement to usual and customary charges for necessary health care services rendered. Defendant Virginia Chiropractors Association, Inc. (VCA), a professional organization, sponsors a Peer Review Committee that upon request examines claims submitted to the insurer to determine if the claim exceeds a reasonable, usual and customary charge for that service. The individual defendants, Doctors Wright, Dodge, Goodfield, Henderson and McClelland are past members of the VCA Peer Review Committee. Defendant William Vohringer is the president of the Association and in that capacity is responsible for appointing the members of the Peer Review Committee. The defendant American Chiropractic Association (ACA) is a non-profit professional organization incorporated in Delaware. Its principal place of business is Des Moines, Iowa. The ACA maintains an Insurance Commission which has a peer review subcommittee and an Appeals Review Committee. The latter committee is organized to review appeals of decisions by state peer review groups.

As stated in the pleadings and amplified in memoranda and oral arguments, the plaintiffs allege that the VCA Peer Review Committee determines the usual and customary fee for services performed and therefore the insurer's liability under the policy, by using a fee schedule supplied by the ACA. The committee then informs the insurance company of its obligation on that claim. Plaintiffs further allege that the committee has set a fixed maximum compensation that the insurers should reimburse per office visit, and that maximum is not adequate to compensate for the more numerous and intensive treatments performed in each office visit by these plaintiffs. The insureds who are plaintiffs' patients are therefore not reimbursed for all treatments performed within that one office visit. The plaintiffs argue that this situation results in a partial boycott, i. e., the insurers in combination with the VCA and ACA refuse to deal with the service providers for those chiropractic services performed during one office visit that are billed above the maximum fixed fee per visit. They further claim that the result of this conspiracy is to coerce plaintiffs' patients not to continue to use plaintiffs' serv-

ices because they will not be adequately reimbursed for those services, and to coerce chiropractors themselves to adhere to the VCA/ACA fee schedule. They have stated that the conspiracy is directed at these plaintiffs because their theory of chiropractic treatment differs from that of the members of the VCA.

Plaintiffs have also asserted ancillary state claims against the individual defendants and the VCA for interference with contractual relations and for libel and slander for which they seek compensatory and punitive damages. All defendants have motions pending before the court. The insurance companies have moved for dismissal on the ground that the action against them is barred by the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–15. Defendants Virginia Chiropractors Association and the individual defendants have answered the complaint and moved the court to enter judgment on the pleadings on the ground that the claims against them are also barred by the McCarran-Ferguson Act. These defendants have also moved to dismiss the state claims on the ground that the court will lack jurisdiction over those claims if judgment is entered in their favor on the federal antitrust claim. The American Chiropractic Association has moved to quash service of process and to dismiss for lack of personal jurisdiction and improper service. This defendant has also moved for summary judgment in its favor on the merits. For the reasons below, all defendants motions are denied at this time.

## A. INSURANCE COMPANY DEFENDANTS

■ The insurance companies maintain that the McCarran-Ferguson Act which exempts the business of insurance from the federal antitrust laws and other statutes to the extent regulated by ·the states, in the absence of conduct amounting to boycott, coercion, or intimidation bars this action against them. The plaintiffs have conceded that these insurer-defendants come within the "business of insurance" and are regulated by the state, but claim that the McCarran-Ferguson Act does not shield their conduct from Sherman Act liability because the defendants have engaged in boycott, coercion and intimidation, 15 U.S.C. § 1013(b).

These defendants' first argument in support of their motion is that plaintiffs' allegations, if true, at most show that defendants may have engaged in a price fixing agreement but not conduct that falls within the traditional antitrust concept of a boycott. Second, they urge that the terms "boycott, coercion, or intimidation" used in the McCarran-Ferguson Act have been given a very narrow interpretation and been limited to apply only to boycotts of other insurance companies or insurance agents, conduct not alleged by these plaintiffs.

The latter interpretation of the "boycott" language is most firmly rooted in the Ninth Circuit, *Addrisi v. Equitable Life Assurance Society*, 503 F.2d 725, 728–29 (9th Cir. 1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975), but is not the rule in the Fourth Circuit, *Ballard v. Blue Shield of Southern West Virginia, Inc.*, 543 F.2d 1075 (4th Cir. 1976), *cert. denied*, 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977). One reason for this interpretation has been that the McCarran-Ferguson Act was passed as a response to *United States v. South-Eastern Underwriters Assoc.*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), the case in which the Supreme Court applied the anti-trust laws to insurance companies. In that case defendant insurance companies had engaged in a conspiracy to fix premium rates and had enforced that price fixing agreement by boycotts "together with other types of coercion and intimidation,"[1] to force other insurance companies into the conspiracy. However, the defendants in *South-Eastern Underwriters* also applied coercion against potential customers for insurance as well as the other insurance com-

---

1. *United States v. South-Eastern Underwriters Assoc.*, 322 U.S. 533, 535, 64 S.Ct. 1162, 1164, 88 L.Ed. 1440 (1944).

panies,[2] so that the argument for the narrow interpretation in the cases cited by defendants is not persuasive, and see *Proctor v. State Farm Mutual Auto Insurance Co.*, 561 F.2d 262, 272–74 (D.C.Cir.1977), *cert. docketed* No. 77–580 (U.S. 10/19/77); *Barry v. St. Paul Fire & Marine Insurance Co.*, 555 F.2d 3 (1st Cir. 1977), *cert. granted*, 434 U.S. 919, 98 S.Ct. 391, 54 L.Ed.2d 275. The issues of whether the boycott language applied only to other insurors, and if not whether a boycott under the act is more narrow than under traditional antitrust law, have recently been argued before the Supreme Court by counsel for the insurance company defendants, *Barry, supra*.[3] Until such time as defendants are successful in that appeal, this court declines to adopt the narrow interpretation of the "boycott" language.

At oral argument, these defendants relied primarily on the fact that the conduct alleged does not constitute a traditional antitrust boycott under any interpretation. However, these defendants had at first improperly characterized plaintiffs' complaint as stating that "insurance company defendants will not pay insureds treated by plaintiffs *more* than they would pay for the same services when performed by other chiropractors in the same community."[4] However, the plaintiffs' theory is not that they are paid the same as other chiropractors but that they are unpaid for certain services they perform within one office visit.

Defendants define a traditional boycott in antitrust theory as conduct involving "the use of the coercive force of a collective refusal to deal,"[5] such as in *Klors v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). However, in *Klors*, the condemned conduct not only con-

sisted of a refusal by distributors and manufacturers in conspiracy with the defendant to supply the defendant's competitor on any terms, but also the agreement to sell at less favorable terms than offered to the defendant. That boycott included a refusal to deal except on unfavorable terms. These plaintiffs allege a boycott within that definition that is enforced for the purpose of forcing them to adopt a given course of conduct dictated by the conspirators.[6]

Defendants argue that plaintiffs must allege that the defendants engaged in separate and independent activity to enforce the maximum price which they will pay on the health care claim, such as refusing to allow their policyholders to use the plaintiff chiropractors. They state that a boycott necessarily involves some enforcement activity beyond merely price fixing or exerting economic pressure, *Proctor, supra*. At this point in the proceedings, however, plaintiffs are alleging that their patients were coerced as was alleged of pharmacy customers in *Royal Drug Co. v. Group Life & Health Insurance Co.*, 556 F.2d 1375, 1379 (5th Cir. 1977), *cert. granted*, 435 U.S. 903, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978), or of a farmers cooperative that sought a selling time allotment, *American Federation of Tobacco Growers v. Neal*, 183 F.2d 869, 872 (4th Cir. 1950), or upon manufacturers of gas burners whose customers could not purchase gas, *Radiant Burners, Inc. v. Peoples Gas, Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961). That is, the perpetrators of the boycott need not have directly forbidden the trader-customer, or in this case, doctor-patient, relationship.

Although *Proctor, supra*, is persuasive precedent this court cannot now say that the plaintiffs beyond doubt could not prove

---

**2.** *Id.*

**3.** Reported at 435 U.S. 913, 98 S.Ct. 1465, 55 L.Ed.2d 503.

**4.** Insurance Company Defendants' Memorandum of Points and Authorities in Support of Their Motion to Dismiss the Complaint Against Them at 3. Italics in original.

**5.** *Id.* at 23.

**6.** 11 J. Von Kalinowsky, *Antitrust Law and Trade Regulation*, § 76.02 (1977 ed.); P. Areeda, *Antitrust Analysis* 381 (1974); Brief of Insurance Companies, *St. Paul Fire & Marine Insurance Co. v. Barry*, reported at 435 U.S. 913, 98 S.Ct. 1465, 55 L.Ed.2d 503.

any set of facts to support their claim. In addition, since the coming *Barry* decision may shed added light on the subject of the McCarran-Ferguson boycott exemption, this court will at this time deny the insurance companies motion to dismiss.

## B. VIRGINIA CHIROPRACTORS ASSOCIATION AND INDIVIDUAL DEFENDANTS

■ The Virginia Chiropractors Association and the individual defendants have moved for judgment on the pleadings on the ground that the peer review committee's activities also fall within the business of insurance, and do not constitute a boycott. Therefore, these defendants urge that they come within the McCarran-Ferguson Act exemption. They also have moved the court to dismiss the ancillary claims for lack of jurisdiction.

This motion must also be denied for the reasons above. In addition, the plaintiffs dispute that these defendants engage in the business of insurance. Defendants urge that the exclusion is available to non-insurance companies when their activities are closely related to determining the proper amount of insurer liability on insurance claims, *e. g.* when the non-insurer acts as an insurance adjustor. However, the plaintiffs allege that the VCA's stated purposes, to encourage quality chiropractic services at fair prices, and, less charitably, to enforce the professional views of the VCA regarding proper methods of patient care, are not related to the business of insurance. These allegations, if true, could place the VCA's peer group activities beyond the scope of the business of insurance, *see Proctor, supra*, at 268, fn. 10. The VCA's and individual defendants' motions are therefore denied.

7. *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 373, 47 S.Ct. 400, 403, 71 L.Ed. 684 (1927).

8. *United States v. Scophony Corp.*, 333 U.S. 795, 807, 68 S.Ct. 855, 862, 92 L.Ed. 1091 (1948).

## C. AMERICAN CHIROPRACTIC ASSOCIATION

■ The American Chiropractic Association has moved to quash service of process and dismiss the complaint as to it on the grounds that it had not been properly served and that it is not subject to the jurisdiction of this court. The defendant relies on 15 U.S.C. § 22, the statute that prescribes proper venue for corporations who are antitrust defendants. This statute makes venue proper in any district of which the corporation is an inhabitant, or in which it may be found, or in which it transacts business. The first two alternatives are not met in this case and defendant states that it does not transact business in this judicial district. A corporation will be transacting business in a district within the meaning of this section if, in "the ordinary and usual sense" it transacts business of any substantial character.[7] The test of venue has been described as the "practical, everyday business or commercial concept of doing or carrying on business."[8]

This defendant has stated that it is not qualified to do business in Virginia, has no office in this district, no officers or other agents here, owns no property here, has conducted no seminars or workshops here, and makes no purchases from nor sells its products to this district, except for pamphlets, journals, and educational and public relations materials of small value.

■ The ACA, however, is not a commercial, profit-making organization whose business can be described by sales and purchases, but is a non-profit organization whose activities are described as educational and informative in nature directed toward advancement of the chiropractic profession, the improvement of chiropractic performance and toward better understanding of the profession by the public, insurers, and government.[9] Public relations and profes-

9. Affidavit of Louis O. Gearhart, Executive Director of the American Chiropractic Association, dated June 14, 1977.

sional advancement are its "business". The plaintiffs have alleged that in furtherance of this "business" the ACA has solicited every commercial and educational radio and television station in Virginia for air time, and received air time, billboard space and newspaper space valued at more than $250,000 for the years 1974–76. The ACA provided the radio and television recordings and films, which in 1976 cost $180,000 to prepare. These amounts are substantial and show a continuous solicitation of advertising time in this district in furtherance of defendant's essential purpose, to supply information about the chiropractic profession, *Levin v. Joint Commission on Accreditation of Hospitals*, 122 U.S.App.D.C. 383, 354 F.2d 515 (1965); *Marjorie Webster Jr. College v. Middle States Assoc. of Colleges and Secondary Schools, Inc.*, 302 F.Supp. 459 (D.D.C.1969), *rev'd on other grounds*, 139 U.S.App.D.C. 217, 432 F.2d 650, *cert. denied*, 400 U.S. 965, 90 S.Ct. 367, 27 L.Ed.2d 384 (1970).

The ACA has minimized its role in and its authority over state peer review programs and has stated that development and implementation of peer review has always been the responsibility of the state organization, so that the ACA has not come into this district to participate with the VCA peer review program. However, the ACA has maintained an active training program for state peer review personnel and has trained the Virginia personnel, has actively corresponded with the VCA and its peer review committee (as part of its correspondence with all state associations) and has sent to Virginia guidelines to standardize state peer review, and a relative value fee schedule allegedly used in Virginia, has estab-lished an appeals board for review of peer review decisions and allegedly reviewed a Virginia claim, and has phrased much of the correspondence that has gone to the Virginia Association in the imperative.[10]

The ACA also trains and approves chiropractors as insurance consultants. To be eligible, an individual chiropractor must also have served on a peer review committee. Six individuals have been approved in Virginia.

The ACA therefore has advanced both its purposes substantially and with continuity through a combination of public informational and educational activities in this district so that venue here is appropriate,[11] *Bogus v. American Speech and Hearing Assoc.*, 389 F.Supp. 327 (E.D.Pa.1975). Service of process upon the ACA's agent in Delaware, its state of incorporation, was also proper pursuant to 15 U.S.C. § 22.

■ The ACA has also moved this court for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendant's first memorandum in support of this motion stated that the sole issue of law presented by the motion is "whether defendant American Chiropractic Association ("ACA") combined and conspired with the other defendants herein to fix and maintain the fees of chiropractic practitioners, and thereby unreasonably restrained the trade and commerce of the plaintiffs and other chiropractors in the furnishing of chiropractic services, in violation of Section 1 of the Sherman Act."[12]

Defendant has presented thirty-five "material facts as to which there is no genuine issue."[13] A number of these facts relate to

10. The ACA has stated that the correspondence and fee schedule sent to the VCA were sent by Montfort C. Mitchell, D.C., Chairman of the ACA Insurance Commission, but that he is not an officer, employee, or agent of the ACA. A review of this correspondence, however, shows that it clearly bore the imprimatur of the ACA and that the recipient could reasonably believe that Dr. Mitchell acted on behalf of the ACA and in an official capacity.

11. The parties have not always distinguished the State of Virginia and the area that is the Western District of Virginia. However, if the plaintiffs were to prove venue in the Eastern District, in which defendant has had additional contacts, we assume that case would be consolidated with this action against the VCA and the insurers in this district.

12. Memorandum of Points and Authorities In Support of Defendant ACA's Motion for Summary Judgment, at 1.

13. The "material facts" were incorrectly numbered so that the Memorandum presents them as thirty-four facts.

ACA's description of its role in relation to state peer review committees as being purely advisory.[14] Another group describes the thirty-six Peer Review Leadership Training Programs conducted by the ACA in which trainees are advised, *inter alia*, that their function is not to establish the chiropractor's usual and customary charge for insurance contract purposes, but to ascertain what that charge is.[15] The bulk of the remaining "facts" describes the history of the hostility of the medical profession and health insurance industry to chiropractic, and the struggle that the chiropractic profession has maintained to both persuade health insurers to include chiropractic services in health insurance coverage and to allow peer review committees composed of chiropractors to assist in determining the amount of insurance coverage. Defendant's last material fact is that its peer review appeal committee has never reviewed any claims from the VCA.[16]

The ACA contends that the plaintiffs have not established that any of the defendants have conspired to fix prices, or in the alternative, that the ACA conspired with any of the other defendants, assuming that those defendants did engage in price fixing. It bases this argument primarily on its assertions that its role in peer review is purely advisory, that its advice to trainees is that they are to act only as mediators between insurers and insureds, and that it also teaches that peer review should not in any way interfere with the relationship or fee payment between doctor and patient. However, as stated above, the court finds that certain ACA Peer Review Guidelines and correspondence from its insurance committee are phrased in a style more imperative than advisory,[17] and the inferences from those memoranda, guidelines, and the ACA's relative value schedule are still in issue. The parties also dispute the role played by the ACA in reviewing a VCA

peer review decision in 1977, and the extent to which the procedure interferes with the fee paid to a treating chiropractor by his patient. At this point in the proceedings then defendant is not entitled to judgment as a matter of law on the issue of the existence of price fixing, or whether the ACA combined or conspired to maintain such a price fix.

Defendant has also argued in its second memorandum and at oral argument on this motion that were the peer review procedure considered a restraint of trade other than a price fixing agreement then under the rule of reason the procedure does not violate the anti-trust laws. For this purpose, ACA has again outlined the history of peer review, reasons for its adoption, and its purposes. As stated above, the ACA describes its continuing attempts to maintain both insurance coverage for chiropractic services, and peer review by chiropractors rather than medical doctors, and also to retain the viability of the chiropractic profession in the health care market. It argues that this history and the purposes of peer review justify any restraint under the rule of reason. This issue is also not suitable for summary judgment at this time. Plaintiffs dispute the applicability of the rule of reason, and the purposes of the peer review procedure, inferring that it is also used as a method of coercion against chiropractors who practice intensive care therapy, a theory of practice that has not been endorsed by the ACA.

In sum, the defendants have not shown that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. The motion for summary judgment is therefore denied.

---

14. Material Facts # 3–13.

15. Material Facts # 14–18.

16. Material Fact # 34.

17. *See, e. g.*, Letter of Montfort C. Mitchell, D.C. to State Association presidents, dated January 3, 1973, Exh. A to Defendant ACA's Answers to Plaintiff's Interrogatories; Peer Review Guidelines quoted in Material Facts # 5, 8 Defendants Memorandum, *supra*.